**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| YOSUF CHAUDHRY & AMENA ALVI, | CASE NO. 3:20-CV-50381 |
| PLAINTIFFS, | |
| V. | HONORABLE IAIN D. JOHNSTON |
| PIERRE THORSEN, | |
| DEFENDANT. | |
| PIERRE THORSEN, | |
| COUNTER-PLAINTIFF, | |
| V. | |
| YOSUF CHAUDHRY & AMENA ALVI, | |
| COUNTER-DEFENDANTS. | |

**MEMORANDUM OPINION AND ORDER**

This action is before the Court on cross-motions for summary judgment. Defendant Pierre Thorsen has moved for summary judgment on all claims brought against him, as well as on the liability element of his counterclaim. Meanwhile, plaintiffs Yosuf Chaudhry and Amena Alvi seek summary judgment on three of the five claims brought against Thorsen and his counterclaim. For the below reasons, Thorsen's motion for summary judgment [282] is granted in part and denied in part. Chaudhry and Alvi's motion for summary judgment [284] is denied. All claims brought against Thorsen are dismissed.

## I.    Factual Background[1]

Pierre Thorsen was a social studies teacher in Community Unit School District #300, where he taught various subjects at Harry D. Jacobs High School (herein "Jacobs") in beautiful Algonquin, Illinois. Thorsen Statement at ¶¶ 1, 2. In this role, he was assigned to teach the impact of major world religions. *Id.* at ¶ 2. Thorsen identifies as Christian. Chaudhry & Alvi Statement at ¶ 7. Outside of school hours, Thorsen regularly attended church, taught Bible study, and dating back to at least the late 1990s, served as the faculty sponsor to student-led Bible study, which later became a student group called Uprising. *Id.* at ¶¶ 11-12; Chaudhry & Alvi Statement at ¶ 18.[2]

Aliya Chaudhry is the daughter of Yosuf Chaudhry and Amena Alvi.[3] *Id.* at ¶ 2. Chaudhry and Alvi identify as Muslim. *Id.* at ¶ 4. Aliya was enrolled at Jacobs from 2017–2019. *Id.* at ¶ 3. While at Jacobs, Aliya took two classes taught by Thorsen: "World History" in her freshman year and "War and Conflict" in her sophomore year.

---

[1] When possible, these facts are taken from both Local Rule 56.1 Statements of Material Facts, at dkt. 282-2 (herein referred to as Thorsen Statement) and dkt. 284-3 (herein referred to as Chaudhry & Alvi Statement). Unfortunately, parties frequently and needlessly bicker, objecting to and disputing facts that are not actually in dispute—or providing their own subjective characterizations of those facts— causing the Court to examine the record itself in detail and effectively eliminating the entire purpose of Local Rule 56.1. This briefing and other recent summary judgment briefing in other cases has caused the Court to seriously question the utility of Local Rule 56.1.

[2] Thorsen's objections to relevance, undue prejudice, foundation, and impermissible use of a witness's religious beliefs, contained in his response to Chaudhry & Alvi Statement ¶ 18, are overruled at this time. The Court finds the matters are relevant or they wouldn't be included in this Order. The Court is not unduly prejudiced by having read these facts. Tim Christians discussed the petition to reinstate Thorsen at his deposition, providing a foundation. And obviously the Court is not using the facts for any improper purpose related to Thorsen's credibility, because the Court can't make credibility determinations at summary judgment.

[3] The Court profusely thanks attorneys Daniel Weiss and Brandon Polcik for accepting the Court's assignment to represent Aliya in this litigation. The Court assigned Mr. Weiss and Mr. Polcik after counsel for Chaudhry and Alvi asserted that he didn't represent Aliya, despite originally naming her as a plaintiff. *See* First Amended Complaint [5] at ¶ 11 ("Plaintiff B.D. is a student at Jacobs High School in Algonquin, IL.").

*Id.* at ¶¶ 21, 29. Aliya attended two or three Uprising meetings.[4] A. Chaudhry dep. at 10:1-10:3; 65:10-65:14.

Before arriving at Jacobs or ever meeting Thorsen, Aliya was actively questioning her religion. Thorsen Statement at ¶ 13; A. Chaudhry dep. at 10:9-10:13 (describing her "los[s] of faith in Islam" as occurring "[her] entire life"); 18:24-19:6 (describing herself as always having been "bad at being Muslim" and "want[ing] to be done with it"); 38:4-39:23 (describing in detail her longstanding criticisms of Islam, including not wanting to wear a hijab, being told as a child in Islamic Sunday School that it was a sin to eat with her left hand, not being good at praying, and not enjoying fasting).

Eager to learn about Christianity, she approached Thorsen and inquired about historical proof of the Bible and Christianity. Thorsen Statement at ¶¶ 6, 8. Aliya chose to speak to Thorsen because "[h]e was a history teacher, he seemed to know more about religion in a historical context, and he was just a nice guy to talk to." A. Chaudhry dep. at 10:14-10:18 (cleaned up). In addition to speaking with Thorsen, she read the Bible on her own and performed independent research about different faiths. Thorsen Statement at ¶¶ 9, 43.

In her conversations with Thorsen, Aliya asked him questions about Christianity, finding him to be non-judgmental. *Id.* at ¶¶ 26-27; A. Chaudhry dep. at

---

[4] Chaudhry and Alvi characterize Uprising post-2018 as an "apologetics club," where Thorsen taught the ability to defend Christianity against common criticisms. Chaudhry & Alvi Statement at ¶ 13. This assertion isn't supported by the factual record. At some club meetings, the topic of apologetics was discussed. Thorsen dep. at 58:13-58:18; 82:3-84:14. Some students asked Thorsen to discuss apologetics at a second weekly Uprising meeting. *Id.* at 85:15-86:21. These were also student-led. *Id.* at 84:6-84:14. It doesn't appear Aliya was present for any of these meetings. A. Chaudhry dep. at 141:6-141:23. *See also* Thorsen dep. at 82:2 ("There was no apologetics club.").

3

140:5-140:9 (describing Thorsen's nonjudgmental nature as "[a]ny time I disagreed with him, he didn't get upset or try and push me any direction. He was just really kind."). On the other hand, Thorsen asked questions of Aliya on two occasions related to her knowledge of the marriage between the Prophet Muhammad and Aisha bint Abi Bakr.[5] Thorsen Statement at ¶¶ 24-25, 28. Aliya found these questions to be a "little bit out of pocket," but also described the ability to talk about it as "fun" because the topic was not one she could talk about at home. *Id.* at ¶ 25; A. Chaudhry dep. at 94:18-94:22. When their conversations began, Aliya did not know that Thorsen was Christian. A. Chaudhry dep. at 95:15-95:17. But, at some point, Thorsen "briefly" shared his journey to Christianity with Aliya. *Id.* at 135:4-135:11.

At times, Aliya would debate religion with Thorsen. Thorsen Statement at ¶ 32; A. Chaudhry dep. at 119:21-120:2 (describing the debates as "debating [her]self"). But Aliya never heard Thorsen denigrate any religion. Thorsen Statement at ¶ 18; A. Chaudhry dep. at 12:8-12:10. In these debates, Aliya would "outwardly" support the general beliefs of Islam. A. Chaudhry dep. at 118:11-118:16. By Aliya's sophomore

---

[5] Aisha's age is a source of debate among religious scholars. *See, e.g.,* Waqar Akbar Cheema, *The Age of Aisha: An Appraisal of the Traditional and Revisionist Perspectives*, Islamic Center for Research and Academics (Jan. 23, 2024). Some early texts record that Aisha was six-years-old when she married Muhammad and nine-years-old when the marriage was consummated. *See* Denise Spellberg, *Politics, Gender, and the Islamic Past*, Columbia Univ. Press 39 (1994). Other scholars believe she was as old as 18. Arnold Mol, *Aisha (ra): The Case for an Older Age in Sunni Hadith Scholarship*, Yaqeen Institute (Oct. 3, 2018). And still others argue her age is immaterial, because early marriage was a common practice in the 7th century. Asadullah Al-Andalusi, *Understanding Aisha's Age: An Interdisciplinary Approach*, Yaqeen Institute (Oct. 2, 2018). In addition to being a source of debate, it is also a modern criticism of Islam, and in some instances a source of alleged Islamophobia. *See, e.g.,* Arshad Zargar, *India Faces Fury Over Officials' "Islamophobic" Remarks on Prophet Muhammad*, CBS News (June 6, 2022). The merits to any side of the debate are immaterial to deciding this motion.

year, she was initiating daily conversations with Thorsen about religion. *Id*. at 23:20-23:23; 120:22-121:4.

Thorsen encouraged Aliya to speak with her parents or an imam about her apprehensions with Islam. Thorsen Statement at ¶¶ 60, 62. She informed Thorsen that she couldn't speak to her parents because they would yell at her. *Id*. at ¶ 61. She also expressed concern that her father would make her leave the home. A. Chaudhry dep. at 21:20-21:23 (describing fears that she was going to be kicked out and that her parents would not love her anymore). These fears stemmed in part from conversations Aliya had in the home in which her father described needing to respect the government of the country you're in, even if that includes killing individuals for leaving Islam. Thorsen Statement of Additional Facts at ¶ 19.

Thorsen connected Aliya with individuals whom he believed could assist her, including Hedieh Fardi, Thorsen's neighbor who had converted from Islam to Christianity, and Britt Priest, a former student of Thorsen's who had also discussed religion with Thorsen. Chaudhry & Alvi Statement at ¶ 53; A. Chaudhry dep. at 121:16-123:10. Through conversations with Thorsen, Aliya was also connected with two fellow students at Jacobs—Tristan and Carolyn—both of whom identified as Christian. *Id*. at 147:23-150:14; 153:1-153:13. In text messages between Aliya and these individuals, they discussed religion and their respective journeys to Christianity. Chaudhry & Alvi Statement ex. 7-9 and 16.[6] Thorsen also provided

---

[6] Thorsen's objections to foundation, authenticity, and hearsay contained in his responses to Chaudhry & Alvi Statement Exhibits 7-9 and 16 are overruled for the purpose of deciding this motion. These text chains were discussed in Aliya's deposition, providing a basis for their admission at this stage. Further, Thorsen provides no basis for the exhibits not being authentic. Finally, the Court will pass on deciding

Aliya with his pastor's contact information, but they never spoke. A. Chaudhry dep. at 26:1-26:8.

Texts with Carolyn indicate that Aliya was not interested in Christianity before meeting Thorsen, that Aliya tried for four months to prove Thorsen wrong, and that Thorsen had "defend[ed] the faith" with Carolyn. Chaudhry & Alvi Statement ex. 7 at P1568. Tristan texted Aliya that Thorsen saw him change from an "insane satanic madman to a zealot pious Christian." Chaudhry & Alvi Statement ex. 8 at P1917. Through other texts, Fardi offered Aliya a room to stay in if her parents were to "kick [her] out" and planned to give Thorsen a study Bible to give to Aliya. Chaudhry & Alvi Statement ex. 16 at P1669. Thorsen ultimately gave Aliya this Bible from Fardi, at Aliya's request. *Id.* at P1682; Thorsen Statement at ¶ 10; Thorsen dep. at 269:23-270:12.

In contrast, in texts between Aliya and Tristan, Aliya states "[Thorsen] didn't even convert me, God did." Chaudhry & Alvi Statement ex. 8 at P1917 (cleaned up). "Most of my beliefs came from me working on it on my own. Mr. [Thorsen] just simply discussed with me … [God] is the best mentor." *Id.* And, in a text exchange with Priest, Aliya remarks that Thorsen "never used the [B]ible for any of [his arguments]." Chaudhry & Alvi Statement ex. 9 at P1463. Fardi told Aliya "[y]ou can't leave at 15… You can endure at 15." Chaudhry & Alvi Statement ex. 16 at P1619.

---

a hearsay argument related to these text messages at this time. Fed. R. Civ. P. 56(e) permits a summary judgment motion to be opposed by any kind of evidentiary materials listed in Rule 56(c). This includes electronically stored information, like text messages. At trial, Chaudhry and Alvi would likely face an uphill battle to admit these messages for their truth. However, another permissible purpose—like impeachment—is more plausible.

What's more, Aliya's messages with Carolyn and Priest show that Aliya was going through extreme mental turmoil during the time these messages were sent, experienced a mental breakdown, and was hospitalized for thoughts of harming herself.[7] Chaudhry & Alvi Statement ex. 7 at P2002, P0982; ex. 9 at P0494.

Aliya's parents attended parent-teacher conferences and spoke to Thorsen; however, the parties dispute the extent and nature of these conversations, particularly the extent to which the parents were aware that Thorsen and Aliya were discussing religion. *Compare* Chaudhry & Alvi Statement at ¶ 44 *with* Thorsen Response to Statement of Facts at ¶ 44; *see also* Thorsen Statement ex. 8 at p. 1. Thorsen was concerned about how Aliya's parents would react to her conversion though, citing knowledge of "honor killings" that occur upon conversion in some Islamic countries. Thorsen dep. at 184:3-186:8.

Aliya converted to Christianity on November 14, 2018. A. Chaudhry dep. at 54:6-54:9. She asserted—then and now—that this was a result of her own independent research. *Id.* at 129:9-130:1; Thorsen dep. at 208:21-209:7. On February 6, 2019, Aliya's parents found her reading a Bible in her room. A. Chaudhry dep. at 57:14-57:20. She told her parents that she had left Islam. *Id.* at 57:21-57:24. They were upset; however, no abuse occurred and no threats were made. Chaudhry & Alvi Statement at ¶ 58.

---

[7] Again, the Court thanks assigned counsel for representing Aliya during this difficult litigation. After Chaudhry and Alvi's counsel disclaimed representing Aliya (despite naming her a plaintiff), the Court held a hearing to discuss Aliya's participation in this action. Dkts. 97, 98. The Court's concern for Aliya's wellbeing was a basis to assign these excellent attorneys.

After reviewing Aliya's text messages, Chaudhry and Alvi subsequently lodged a complaint against Thorsen with Jacobs administration. *Id.* at ¶ 62.[8] After a brief internal investigation, the school determined that Thorsen had violated several school district policies.[9] *Id.* at ¶¶ 65-67; Chaudhry & Alvi Statement ex. 19. Thorsen was suspended without pay for ten days. Chaudhry & Alvi Statement at ¶ 68. The next year, he was transferred to another school in the district and subsequently resigned.[10] *Id.* at ¶¶ 6, 68.

Following Thorsen's resignation, a petition circulated online, attempting to reinstate Thorsen at Jacobs. Christians dep. at 13:13-13:18. On this petition, at least one former student, Tim Christians, made seemingly derogatory comments about Thorsen, stating that Thorsen "uses his position to mind warp the young," that Thorsen "does spiritual warfare with demons," and that he "prays (sic) on the youth." Chaudhry & Alvi Statement ex. 11. But when deposed, Christians denied memory of what he said on the petition and reported having a positive experience with Thorsen.

---

[8] Thorsen's objections to relevance, undue prejudice, foundation, authenticity, and hearsay contained in his response to Chaudhry & Alvi's Statements ¶¶ 62-63 and 65-68, as well as exhibits 19-21, are overruled at this time. The Court finds the matters are relevant or they wouldn't be included in this Order. The Court is not unduly prejudiced by having read these facts. Thorsen provides no basis for the exhibits not being authentic. Thorsen, Aliya, and Jacobs High School principal Barbara Valle each discuss the investigation into Thorsen's conduct in their deposition testimony, providing a foundation, as well as a route for Thorsen's suspension to be considered regardless of the exhibits. Finally, the Court will pass on deciding a hearsay argument related to these records at this time. It seems likely that most of these exhibits fit into an exception (e.g., business records exception, *see* Fed. R. Evid. 803(6)) or otherwise would not be offered at trial for its truth (e.g., for Thorsen's knowledge and/or Aliya's impression).

[9] Thorsen disputes having violated many of these policies. Thorsen dep. at 277:9-284:1. Thorsen's separation from Jacobs High School is the subject of different litigation. *See Thorsen v. Cmty. Unit Sch. Dist. 300*, Case No. 3:20-cv-50132, 2024 U.S. Dist. LEXIS 229678 (N.D. Ill. Dec. 19, 2024).

[10] Thorsen denies that he resigned voluntarily. Thorsen Response to Statement of Facts at ¶ 6; Thorsen dep. at 288:6-288:9.

Christians dep. at 13:21-14:4. Christians identified as Christian when he enrolled at Jacobs High School. *Id.* at 14:12-14:16.

In October 2020, Chaudhry and Alvi filed this suit against District #300, the then-superintendent of District #300 Fred Heid, and Thorsen. Dkt. 1. Nearly a year later, in June 2021, the parents—apparently with the desire to "push the lawsuit to have some sort of resolution"—made public comments to news media outlets, notwithstanding ongoing federal litigation. Thorsen Statement at ¶ 17; Alvi dep. at 22:8-22:9. Articles quoting Chaudhry and Alvi describe Thorsen as having "brainwashed," "groomed," and "indoctrinated" Aliya, while alleging he "proselytize[d] their daughter and other students through a Christian school club." Thorsen Statement at ¶¶ 17-21. The articles also claimed that "[Aliya] hadn't independently researched other faiths to come to that conclusion [of conversion]." Thorsen Statement at ¶ 23; Thorsen Amended Answer and Counterclaim ex. 1.

But reflecting on her experience in high school, Aliya herself denies having been brainwashed and believes Thorsen was an "amazing" teacher. Thorsen Statement at ¶ 14. Aliya reported being familiar with the term "grooming" as being generally used in the context of sexual abuse and denied Thorsen grooming or indoctrinating her. A. Chaudhry dep. at 30:5-30:21. Yosuf Chaudhry acknowledged that the word "grooming" is used to describe pedophiles but denied intending for it to be used that way in the article. Thorsen Statement at ¶ 27. Likewise, Amena Alvi acknowledged that people use the term "grooming" with a sexual connotation, but denied that being her intent. Alvi dep. at 12:20-13:8. Aliya was not asked by her

parents whether she researched religion on her own before they gave the interview. Thorsen Statement at ¶ 25.

## II.    Procedural Background

Heid was voluntarily dismissed from the matter by Chaudhry and Alvi after a third amended complaint on April 1, 2022. Dkts. 89, 101. A fourth amended complaint was entered on April 27, 2023. Dkt. 184. It brought twelve claims: five against Thorsen and seven against District #300. Fourth Amended Complaint at ¶¶ 69-187. District #300 was terminated from the action after this Court granted the District's motion to dismiss on December 29, 2023, for failure to state a claim upon which relief may be granted. Dkt. 209; Fed. R. Civ. P. 12(b)(6). Only the five claims against Thorsen remain. They allege: (i) violation of 42 U.S.C. § 1983 under the First Amendment (Establishment Clause); (ii) violation of 42 U.S.C. § 1983 under the Fourteenth Amendment (substantive due process); (iii) violation of 42 U.S.C. § 1983 under the Fourteenth Amendment (Equal Protection Clause); (iv) common law invasion of privacy; and (v) common law intentional infliction of emotional distress. Fourth Amended Complaint at ¶¶ 69-77, 90-97, 111-120, 135-141, and 152-158.

In response to the articles published in June 2021, Thorsen was granted leave to respond with a counterclaim for common law defamation. Dkt. 115.

After *eight* extensions prolonged this matter, fact discovery was finally closed on January 31, 2025. Dkts. 220 and 222. Expert discovery subsequently closed on August 21, 2025. Dkt. 240. The cross-motions for summary judgment now before the Court followed. Dkts. 282 and 284. Chaudhry and Alvi seek summary judgment on

10

their three constitutional claims and Thorsen's counterclaim. Dkt. 284. Thorsen seeks summary judgment on all five of Chaudhry and Alvi's claims, as well as on the liability element of his counterclaim. Dkt. 282.

### III.    Legal Standards

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Genuine disputes of material fact exist when the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court will construe all facts and make reasonable inferences in favor of the nonmovant. *Rickher v. Home Depot, Inc.,* 535 F.3d 661, 664 (7th Cir. 2008). "It is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). But "speculation is insufficient to withstand summary judgment[.]" *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996). Indeed, "the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

When parties file cross-motions for summary judgment, courts must consider each party's motion individually to determine if the summary judgment standard has been met. *Ind. C.L. Union Found. v. Ind. Sec'y of State*, 229 F. Supp. 3d 817, 821 (S.D.

11

Ind. 2017). So here, the Court has considered the parties' respective motions and memoranda, as well as the numerous exhibits each has attached, and drawn all reasonable inferences in the light most favorable to the respective nonmovant. At trial, each party would be required to prove its own case by a preponderance of the evidence. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025).

Qualified immunity is designed to "permit the resolution of many insubstantial claims on summary judgment," avoiding the costs of trial when the legal norms officials are alleged to have violated were not clearly established. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Even if a plaintiff's claim satisfactorily alleges the commission of acts that would violate clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover sufficient evidence to create a genuine dispute as to whether the defendant in fact committed those acts. *Id.*

In civil actions when a defendant has raised the affirmative defense of qualified immunity, a court may—but is not required to—take a two-step approach in resolving the claims against an official. *Pearson v. Callahan*, 555 U.S. 223, 232-36 (2009) (abrogating in part *Saucier v. Katz*, 533 U.S. 194 (2001)). This process involves first deciding whether the plaintiff has alleged a violation of a constitutional right and second determining if the right was "clearly established." *Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). When it is "plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," a court may bypass the procedure

entirely. *Pearson*, 555 U.S. at 237. But when there would be "little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong," taking a two-step approach remains appropriate.[11] *Id.* at 236.

## IV. Analysis

Despite the parties' apparent inability to narrow down a set of undisputed facts, Aliya Chaudhry's deposition leaves very little in dispute.[12]

The long and the short of it follows. Entering Jacobs High School, Aliya—the daughter of Chaudhry and Alvi—identified as Muslim but was actively questioning her faith. In two classes with Thorsen, she established a strong rapport with him. She trusted him enough to approach him and ask personal questions related to her faith, having conversations before and after school. She did this not because he was Christian—she didn't even know he was Christian—but because he was a history teacher, and apparently a good one. In their conversations, Thorsen asked at least one offhanded question on two separate occasions related to an apparent controversy related to Islam. As Aliya gradually chose to convert from Islam to Christianity,

---

[11] On the topic of judicial resources, the parties did the Court no favors in their briefing of these issues. Combined, parties expended nearly 850 pages on factual statements, responses, and exhibits, to "satisfy" Local Rule 56.1—regarding facts that both parties *must* be claiming are largely uncontested by nature of filing cross-motions for summary judgment. And in reality, this 850-page tally is understated by nature of the depositions being provided in Min-U-Script quad format, with four pages of text produced on one page. Despite this, both parties still thought it necessary to devote another seven pages to facts in each of their fifteen-page memoranda. Then did it again in the responses. These decisions deduced nearly six years of litigation to approximately six pages of argument each and left the Court with the unenviable task of analyzing both facts *and* law effectively anew. Because it would have saved no time to eschew a thorough constitutional analysis, the Court elects to take a two-step approach to these issues in deciding qualified immunity.

[12] Shockingly, Chaudhry and Alvi's counsel never bothered to interview Aliya before filing the litigation. Fed. R. Civ. P. 11(b)(3). A reasonable, competent counsel would have done so, then thought twice—if not more—about filing this action.

Thorsen grew concerned for her well-being given the ongoing family dynamics that she professed to him. He connected her to resources in the community, some of which included his own personal connections: a neighbor, a pastor, and former students. He also, at her request, gave her a Bible from one of these connections.

After learning of Aliya's conversion, Chaudhry and Alvi were deeply hurt, and took several actions in response. First, they complained to the school, resulting in Thorsen's separation from the school district. Second, they filed this lawsuit. And finally, they spoke to the media.

### i.  Constitutional Claims

As a matter of law, Thorsen's actions don't violate the United States Constitution prohibitions set forth in the First and Fourteenth Amendment.

### a.  *Standing*

Initially, on its own motion, the Court addresses its concern about Chaudhry and Alvi's standing. Federal courts are limited to deciding only actual "Cases" or "Controversies." U.S. Const. art. III § 2. Article III standing is an essential element to federal subject-matter jurisdiction that courts are duty-bound to address. *Bazile v. Finance Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *see also In re Deere & Co.*, 703 F. Supp. 862, 873 (N.D. Ill. 2023). Indeed, federal courts must police their own jurisdiction even if the parties don't raise the issue. *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Ward*, 563 F.3d 276, 282 (7th Cir. 2009).

Three requirements are necessary for Article III standing: first, the plaintiff must have an injury in fact—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; second, there must be a causal connection between the injury and the conduct complained of: the injury must be fairly *traceable* to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and third, it must be likely—as opposed to merely speculative—that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61.

Chaudhry and Alvi, as the parties invoking federal jurisdiction, "bear[] the burden of establishing standing[.]" *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 939 (7th Cir. 2016). The elements of standing must be supported with the quantum of evidence required at each successive stage of litigation. *Id.* At the summary judgment stage, "the plaintiff can no longer rest on … mere allegations, but must set forth by affidavit or other evidence specific facts." *Id.* (quoting *Edgewood Manor Apartment Homes, LLC v. RSUI Indemnity Co.*, 733 F.3d 761, 771 (7th Cir. 2013)) (internal quotations omitted).

A third-party claim—brought by someone on behalf of another injured party— is normally impermissible, as "claims are best prosecuted by those who actually have been injured, rather than by someone in their stead." *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy'

15

requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

Chaudhry and Alvi have now made clear—after being anything but clear at the outset of this case—that they are *not* making a claim on behalf of Aliya. That's good, considering she clearly wants nothing to do with it. *See* dkt. 98 at 16:19-16:25 (Aliya expressing to the Court in March 2022 that she "really can't take this for another year" and that the case is causing her emotional distress).

Absent a third-party claim, Chaudhry and Alvi are required to plead a *personal* injury in fact. *Lujan*, 504 U.S. 555 at 560. When minor children are involved, parents possess an expanded constitutional interest in their children's lives, including at school. *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 224 n.9 (1963). To briefly get ahead of ourselves, in the Establishment Clause context, parents have standing to raise a claim when the impermissible establishment of religion might inhibit their right to direct the religious training of their children. *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 684 (7th Cir. 1994). And in the substantive due process context, parents obviously possess a fundamental liberty interest in "bear[ing] and rais[ing] their children." *Doe v. Heck*, 327 F.3d 492, 518 (7th Cir. 2003); *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011).

Despite this, the harm alleged by a parent still must be *personal*. When parents are bringing their own claims—as opposed to claims on behalf of their minor children—the parents can't rely solely on interference with the rights of their children

16

and must instead demonstrate that the alleged violation directly impacts their own rights. *Ervins v. Sun Prairie Area Sch. Dist.*, 609 F. Supp. 3d 709, 720 (W.D. Wis. 2022). At the very least, Chaudhry and Alvi's motivations seem to belie this requirement. *See* Alvi dep. at 82:3-82:9 (describing telling Aliya that they were filing a lawsuit "… and that we're doing it *for her* because we want *her* to realize that *she* was manipulated.") (emphasis added).

To put any constitutional claim in context, to proceed to trial—let alone prevail—on any of their § 1983 claims, Chaudhry and Alvi must demonstrate there is at least a genuine dispute of material fact that "(1) [*they* were] deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon [*them*] by a person or persons acting under color of state law." *First Midwest Bank v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021) (quoting *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)) (emphasis added).

This is a close call, even making all inferences in favor of Chaudhry and Alvi. Evaluating the standing requirements of *Lujan*, Chaudhry and Alvi have certainly pled sufficient injury, including medical expenses, mental anguish, and daily suffering. Chaudhry & Alvi Statement at ¶ 73[13]; Y. Chaudhry dep. at 43:18-49:15. And that harm would presumably be redressed with compensation following a

---

[13] Thorsen's objection to exhibit 23, contained in his response to Chaudhry & Alvi Statement ¶ 73, is sustained. First, the "personal statement" is not a sworn document. It's not a declaration, affidavit, or sworn under penalty of perjury in any way. Fed. R. Civ. P. 56(c)(4). Second, "self-serving statements in affidavits *without factual support in the record* carry no weight on summary judgment." *Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 807-08 (7th Cir. 2025) (quoting *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004)). Both Yosuf Chaudhry and Amena Alvi were deposed. *See* Chaudhry & Alvi Statement ex. 2 and 3. To the extent information in this statement is not supported by the record, it is not considered by the Court.

favorable decision. *See generally, Adco Oil Co. v. Rovell*, 357 F.3d 664, 665 (7th Cir. 2004) (standing is proper when a "[plaintiff] wants money damages for a tort, and a favorable judicial order would redress the injury."). But whether Chaudhry and Alvi's injury is sufficiently *traceable* to Thorsen's actions (as opposed to being the result of the independent action of some third party not before the court, i.e., Aliya) is far less clear—even after nearly six years of litigation. Aliya was questioning her faith, didn't want to be Muslim, and was "eager" to learn about Christianity, long before meeting Thorsen. Thorsen Statement at ¶¶ 8-9; A. Chaudhry dep. at 38:1-39:23 ("My problems were with Islam always."). She read the Bible on her own and was actively researching faiths. Thorsen Statement at ¶¶ 9, 43.

As Yosuf Chaudhry said himself, "[f]rom all accounts, Aliya… was someone that identified as a Muslim but, probably, lukewarm. And in that lukewarmness, she was open to other ideas." Y. Chaudhry dep. at 22:20-22:24. He further admitted that "Aliya was resistant [to Islam]." *Id.* at 23:13. Chaudhry and Alvi themselves only spoke to Thorsen at two parent-teacher conferences, one of which Chaudhry described as "rushed" because "we were trying to go from one class to another." *Id.* at 34:18-34:24; Alvi dep. at 40:1 (describing having arrived late to the second conference). Had Aliya not been randomly assigned to Thorsen's classroom, it seems undisputed that she was not long for Islam.

Parents suffer no legal injury when their child uses his or her own free will and independent judgment to embrace beliefs that differ from their own. Yet Chaudhry and Alvi attempt here to assign causation to Thorsen, in his capacity as a public

18

school teacher, for having (i) given Aliya a Bible, also available in classrooms and public libraries, (ii) spoken to Aliya before and after school about religion, a topic in the curriculum of both classes she took with Thorsen, (iii) spoken to her twice about a matter of debate amongst religious scholars—albeit controversial—in Muhammad's marriage to Aisha, (iv) spoken to a Christian student group for which he served as the faculty sponsor, one that Aliya only attended two or three sessions, and (v) connected her to adults in the community and fellow students.

So, can Chaudhry and Alvi's mental anguish resulting from their daughter's conversion be *traced* to Thorsen? Or was Aliya's conversion—and the mental anguish it caused her parents—an inevitable runaway train that had left the station long before Aliya entered Thorsen's classroom, because Aliya was just never going to be a lifelong Muslim? For today, the Court will find it has standing to decide these claims. Taking every fact in a light most favorable to Chaudhry and Alvi, evidence *could* support a finding that Thorsen caused or contributed to Aliya's decision to convert.[14] That's all that needs to be decided for now. The Court will proceed with its analysis.

### b. Establishment Clause

As a matter of law, the Establishment Clause fails to provide an avenue to relief to Chaudhry and Alvi.

---

[14] The Court acknowledges that the parties have also not briefed the issue. Though the Court is duty-bound to address Article III standing *sua sponte*, it would rather address the issue only after both sides can be heard when faced with a close call. And, after six years of litigation, the Court wasn't about to disrupt already shambolic summary judgment briefing to order the parties to address standing. The Court isn't masochistic. Because standing can be raised at any time, it can be revisited later if needed.

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion[.]" U.S. Const., amend. I. The Fourteenth Amendment has long applied the First Amendment to the states and state actors, such as Thorsen. U.S. Const., amend XIV § 1; *Wallace v. Jaffree*, 472 U.S. 38, 42 n.10 (1985) (citing *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947)).

To determine whether an activity conforms with the Establishment Clause, one must look to whether the practice "accor[ds] with history and faithfully reflec[ts] the understanding of the Founding Fathers." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 536 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)) (internal quotations omitted). *Kennedy* abrogated *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which provided the appropriate standard for an Establishment Clause violation when this complaint was brought, but is no longer controlling.

Chaudhry and Alvi advance two long-accepted theories for an Establishment Clause violation: the "endorsement" theory and the "coercion" theory. Chaudhry & Alvi Memorandum at 9-11. *Kennedy* expressly abrogated the endorsement test. *Kennedy*, 597 U.S. at 535 ("In place of *Lemon* and the endorsement test…").

The "coercion test," on the other hand, is accepted in the Seventh Circuit to evaluate Establishment Clause violations and remains good law post-*Kennedy*. *Woodring v. Jackson Cnty.*, 986 F.3d 979, 988 (7th Cir. 2021) (citing *Lee v. Weisman*, 505 U.S. 577 (1992)); *see also Williams v. Bd. of Ed. of City of Chi.*, 673 F. Supp. 3d 910, 921 (N.D. Ill. 2023). There is a traditional understanding that "permitting

20

private speech is not the same thing as coercing others to participate in it." *Kennedy*, 597 U.S. at 541.

Several factors are relevant to determine whether a student or students have been coerced into religious activity, including "whether (1) the school 'had a captive audience on its hands,' (2) there was any 'religious activity in which [students] had to partake,' and (3) students 'felt pressured to support the religious aspects of the [activity] when they saw others … reflecting on the religiosity of the [activity.]'" *Williams*, 673 F. Supp. 3d at 922 (quoting *Freedom from Religion Found., Inc. v. Concord Cmty. Schs.*, 885 F.3d 1038, 1048-49 (7th Cir. 2018)). Here, viewing the facts in a light most favorable to Chaudhry and Alvi, none of these factors support a violation of the Establishment Clause.

Thorsen didn't have a captive audience in Aliya. To the contrary, he had an entirely voluntary audience. Aliya *sought him out* to have conversations with a trusted adult. To the extent Chaudhry and Alvi attempt to allege that Uprising—or its Bible study progeny—worked through Thorsen to unconstitutionally establish religion, the record belies that argument based upon Thorsen's undisputed description that they were student-led. Thorsen dep. at 62:10-62:11 ("I was just in the room. The president of the [Uprising] club did everything."). In addition to Uprising, the school had at least a Muslim Student Association, which Aliya also attended at times. A. Chaudhry dep. at 24:14-25:8. Furthermore, Aliya—as the only nexus providing plaintiffs with standing—only attended two or three sessions of the Uprising club and admits here too that—as opposed to being a "captive audience"—

21

she actively chose to attend the meetings to seek out Thorsen. *Id.* at 10:1-10:6 ("I wasn't there for the [Uprising] club. I just wanted to talk to Mr. Thorsen.").

Likewise, students weren't required to participate in religious activities. This is not a case of school-sanctioned prayer. Indeed, Aliya told others she appreciated Thorsen's *lack* of use of the Bible in religious discussions. *See* Chaudhry & Alvi Statement ex. 9 at P1463. The Uprising Club met outside school hours, was entirely optional, and was one of multiple religious-based student groups available to students at Jacobs High School.[15]

Finally, as to the third factor, there is no evidence that Aliya "felt pressured to support the religious aspects" of Christianity or the Uprising club when she saw others reflecting on the religiosity of the activity. *Williams*, 673 F. Supp. 3d at 922 (quoting *Freedom from Religion Found., Inc.*, 885 F.3d at 1049)). Again, the record shows voluntariness, not coercion. Aliya sought out Thorsen and participated willingly (two or three times) in the Uprising club.

Thorsen's actions weren't set in a church, nor did they invoke peer pressure, nor did they force choice between religious conformity and attending an activity. *See Freedom from Religion Found., Inc.*, 885 F.3d at 1048; *Lee*, 505 U.S. at 587; *Sante Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 312 (2000); *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 855-56 (7th Cir. 2012). No reasonable jury could find that Aliya was coerced into religious activity.

---

[15] Because Jacobs High School allowed non-religious student organizations to use school property for student group meetings, the Equal Access Act statutorily *required* administrators to allow Uprising to use school property for the same. 20 U.S.C. § 4071(a); *Bd. of Educ. of Westside Comm. Schs. v. Mergens*, 496 U.S. 226, 249-51 (1990).

Certainly, teachers can, through their positions as role models, exhibit a measure of coercion on their own. *Mahmoud v. Taylor*, 606 U.S. 522, 554-55 (2025). But, even so, Thorsen's actions weren't coercive. He never forced Aliya to talk to him. Rather, she initiated their conversations. When they talked, he didn't badger Aliya into changing her beliefs. Instead, he talked with her about his own beliefs *while also* encouraging her to speak to her parents and an imam when she expressed doubts about her religion. It may not have been appropriate for Thorsen to ask Aliya about Aisha's age, or connect her with adults in the community, particularly without at least looping in Jacobs' administration or social workers, if not Aliya's parents. But this doesn't violate the Constitution, because Aliya wasn't coerced into religious activity. Inappropriateness doesn't necessarily violate the Constitution. *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 714 (7th Cir. 2016).

Aside from coercion, the only other test remaining post-*Kennedy*—not fully briefed by either party—is the historical approach explicitly endorsed by *Kennedy*. This is generally a difficult test to adapt to school-sponsored extracurricular activities that didn't exist in the late 18th century.[16] C.R. Van Nice, *The Place of Extracurricular Activities*, 33 The High School Journal 110, 110-111 (May 1950). To the extent one might try to imagine the thoughts of the Founding Fathers on the subject, it's difficult to disentangle religion from early public schooling. Frank Klassen, *Persistence and Change in Eighteenth Century Colonial Education*, 2 History of Education Quarterly 83, 85-88 (June 1962) ("The dominant aim of the

---

[16] Indeed, free public schools were "virtually nonexistent" in the time of the Founding Fathers. *Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987).

23

schools remained a religious one."). Not until Horace Mann revolutionized public schooling in the early to mid-19th century did schools begin to look decidedly more nonsectarian. Jonathan C. Messerli, *Localism and State Control in Horace Mann's Reform of the Common Schools*, 17 American Quarterly 104, 116 (Spring 1965). What insight we do have into historical foundations strongly suggests that "learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Kennedy*, 597 U.S. at 541 (quoting *Lee*, 505 U.S. at 590). So, history lessons aside, it can't be said that Thorsen's actions run afoul of any longstanding tradition in American education. Additionally, it's fair to say that there is "[n]o historically sound understanding of the Establishment Clause that begins to 'make it necessary for government to be hostile to religion' in this way." *Kennedy*, 597 U.S. at 541 (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)).

No matter what formula is used, the answer is the same. Thorsen's actions didn't work or seek to establish religion at Jacobs High School. He spoke with students before and after school, sponsored a Christian-based student group, served as an intermediary to deliver a Bible to a requesting student (a text already readily available in the classroom by the way), and connected a struggling student with external support in the community.

The text message evidence produced by Chaudhry and Alvi doesn't create more than "metaphysical doubt" as to the material facts. *Ortiz*, 94 F.3d at 1127 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586). Even assuming the admission for the truth of the matter asserted of all messages at trial—a lofty and unlikely outcome—

24

they don't establish impermissible coercion in violation of the Establishment Clause. They are nothing more than the ramblings of a teenage texter. Those messages for which reasonable inferences *could* bring about material questions of fact as to coercion were provided with necessary context within Aliya's deposition. *Compare* Chaudhry & Alvi Statement ex. 7 at P1568 (Thorsen "defend[ed] the faith" with Carolyn) *with* A. Chaudhry dep. at 119:15-120:2 (Aliya describing feeling a need to defend Islam "even if [she] didn't believe it" and describing debates as "debating [her]self," clarifying further that Thorsen was not "on the offensive or attacking [her] in any way."). Others are contradicted later within the same correspondence. *Compare* Chaudhry & Alvi Statement ex. 7 at P1568 (Aliya telling Carolyn she was not interested in Christianity before meeting Thorsen) *with* Chaudhry & Alvi Statement ex. 7 at P1569 (Aliya later telling Carolyn that she had read the entire Bible on her own on a cell phone). And even *without* this context, Aliya defending Islam and not being interested in Christianity before meeting Thorsen don't imply coercion. There's no evidence of causation. Indeed, the evidence affirmatively shows a lack of causation. As a matter of law, there's simply insufficient evidence in the record for a reasonable jury to find coercion.

At times it is likely Thorsen answered questions and shared information from his own personal experiences and biases. All teachers do. Some of Thorsen's actions ostensibly violated school district policy. The district acted on that belief. That doesn't create an Establishment Clause violation. Likewise, that some of his support offerings, and the nature of the question-and-answer periods outside of class were

25

religious in nature, doesn't change the analysis. Indeed, it's unsurprising that some extent of religious conversation is to be expected from a history teacher whose curriculum includes the impact of major religions. Frankly, teaching world history without discussing religion would be surprising. Distinguishing between "historical" teachings consistent with what every high school history student should know and "theological" lessons better reserved for Sunday School is a difficult line to draw, but, wherever it is drawn, Thorsen didn't cross it.

As a matter of law, Thorsen's actions didn't impermissibly establish religion in violation of the Establishment Clause. Thorsen's motion for summary judgment is granted as to the Establishment Clause claims.

### c. Substantive Due Process

The Due Process Clause of the Fourteenth Amendment likewise fails to provide an avenue to relief for Chaudhry and Alvi.

The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV § 1. In addition to guaranteeing "more than fair process," the Fourteenth Amendment covers a "substantive" sphere as well, "barring certain government actions regardless of the fairness of the procedures used to implement them." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997); *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Substantive due process violations are actionable under 42 U.S.C. § 1983. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

26

There are two paths to establishing a substantive due process violation on the part of a state actor through 42 U.S.C. § 1983. *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010). The first occurs when a state actor's conduct is such that it "shocks the conscience." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172-73 (1952)). The second occurs when the state actor violates an identified liberty or property interest protected by the Due Process Clause. *Grindle*, 599 F.3d at 589 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). It isn't clear which Chaudhry and Alvi are pursuing, so both will be evaluated.[17] The claim fails either way.

To shock the conscience, "only the most egregious official conduct" is said to be enough. *Catinella v. County of Cook, Ill.*, 881 F.3d 514, 519 (7th Cir. 2018) (quoting *Lewis*, 523 U.S. at 846). For reference, the Supreme Court's lodestar case on the matter, also cited by the Seventh Circuit, relates to the forcible pumping of a criminal suspect's stomach. *Catinella*, 881 F.3d at 519 (citing *Rochin*, 342 U.S. at 172-73). Even in a light most favorable to Chaudhry and Alvi, Thorsen's actions are "miles away" from an actionable claim under a conscience-shocking standard. *Catinella*, 881 F.3d at 519.

---

[17] Chaudhry and Alvi's motion for summary judgment contains no foundation related to the appropriate standard used for establishing a substantive due process violation under 42 U.S.C. § 1983. Only two paragraphs are dedicated to the entire section, providing a barebones recitation to there being a fundamental liberty interest in raising one's children (which is undisputed) and a confusing factual argument without citation to caselaw, before citing to four cases—only one of them binding on this Court—without providing any application of those facts to this case. Chaudhry & Alvi Motion for Summary Judgment at 11-12. The Court could find that such lackluster briefing constructively abandons the claim. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). Preferring final judgments to be made on the merits, the Court declines to do so.

Chaudhry and Alvi likewise fail to establish a material dispute for a factfinder under the second path to relief, requiring violation of an identified liberty or property interest.

To evaluate an alleged constitutional violation under this second prong of substantive due process, the Court must first "provide a careful description of the liberty interest that [plaintiff] seeks to have protected." *Doe v. Bd. of Educ. of City of Chi.*, 611 F. Supp. 3d 516, 537 (N.D. Ill. 2020) (quoting *Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 768 (7th Cir. 2004)); *see also Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Second, the Court must determine whether that interest is "fundamental"—whether it is so "deeply rooted and sacrosanct that no amount of process would justify its deprivation." *Doe v. Bd. of Educ.*, 611 F. Supp. 3d at 537 (quoting *Christensen v. Cty. of Boone, Ill.*, 483 F.3d 454, 462 (7th Cir. 2007)). Then, if the right is fundamental, the Court must ask "whether the government has interfered directly and substantially with the plaintiffs' exercise of that right." *Id.* Finally, if a fundamental right has been impaired, the Court asks whether "the governmental action can find reasonable justification in the service of a legitimate governmental objective, or if instead it more properly is characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.*

The first two questions are rather easily resolved in favor of Chaudhry and Alvi. Narrowly drawn, they assert a liberty interest in raising their children pursuant to their own religious norms and free from government interference. That right is fundamental. *Heck*, 327 F.3d at 518; *Foster*, 657 F.3d at 478.

28

To be certain, the fundamental rights of parents can be "substantially diminished" when they elect to send their children to public schools. *Ca. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020). This includes decisions made with respect to the nature of extracurricular activities. *Id.* Generally, parents also don't have a constitutional right to dictate the curricular and administrative decisions of their children's educators. *Parker v. Hurley*, 474 F. Supp. 2d 261, 269 (D. Mass. 2007); *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025). But, just as with students, parents also don't completely shed their own rights when their children enter the schoolhouse gate. *Tatel v. Mt. Lebanon Sch. Dist.*, 752 F. Supp. 3d 512, 553 n.17 (W.D. Pa. 2024); *Mahmoud*, 606 U.S. at 547; *Meyer*, 262 U.S. at 403; *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925); *see also Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969). Looking to only the careful description of the right, Chaudhry and Alvi's claim that Thorsen interfered with their right to raise Aliya—including defining her religious education— implicates a fundamental liberty interest protected by the Due Process Clause.

But after considering the factual record, as a matter of law, that fundamental right wasn't "directly and substantially" impaired by Thorsen. *Christensen*, 483 F.3d at 462. The question of whether a government action "substantially interferes with the religious development" of a child is fact intensive. *Mahmoud*, 606 U.S. at 550 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). It depends on the specific religious beliefs and practices asserted, the specific nature of the educational requirement or curricular feature at issue, the age of the student, and the specific

context in which the instruction or materials are presented (e.g., if they are presented neutrally or in a hostile manner). *Mahmoud*, 606 U.S. at 550 (citing *Yoder*, 406 U.S. at 211).

To reiterate once more, the actions alleged to be unconstitutional by Chaudhry and Alvi, and supported by the factual record, boil down to these: (i) Thorsen giving Aliya a Bible, also available in classrooms and public libraries, (ii) Thorsen speaking to Aliya before and after school about religion, (iii) Thorsen having spoken to Aliya twice about Muhammad's marriage to Aisha, (iv) Thorsen having spoken about Christianity to a Christian student group, and (v) Thorsen connecting Aliya to adults in the community.

Thorsen was Aliya's teacher. One of his roles was to teach her social studies, but another was to be a role model, a resource, and a supportive adult. Thorsen was assigned with the task of teaching the impact of major world religions. The facts demonstrate that Aliya did no more than ask questions about religion, which Thorsen answered. Thorsen's answers may have appeared one-sided. But Aliya's questions and journey were also one-sided. Aliya was a teenager; impressionable, but perhaps not to the same extent as a very young child. Aliya was not a "young, impressionable child[] who [was] likely to accept without question any moral messages conveyed by [her] teachers' instruction." *Mahmoud*, 606 U.S. at 551. The record clearly reflects she was questioning her religion independently long before meeting Thorsen and, in fact, read the Bible of her own accord, coming to him with her questions. Under these facts, answering a teenager's questions about one's beliefs and providing resources

30

that support those beliefs isn't interference with parental rights. In short, the evidence presented in this case shows there was no proselytizing and there was no substantial interference with parental rights.

Indeed, Thorsen's first reaction when approached by Aliya was to direct her to her parents and an imam. Thorsen Statement at ¶¶ 60, 62. This demonstrates not hostility towards Islam, but neutrality. As the teacher-student relationship evolved into daily conversations about religion, Thorsen's decision to not involve Aliya's parents—or at least administration and/or school social workers—was perhaps unwise and unprofessional, and based in part on negative stereotypes he possessed about Muslims, specifically his knowledge of so-called "honor killings" occurring internationally. But the decision to not involve her parents nonetheless didn't create unconstitutional direct and substantial interference with her parents' rights. As a matter of law, the extent to which Thorsen's contributions interfered with Chaudhry and Alvi's fundamental rights are wholly insufficient to rise to a substantive due process violation.

Evaluating the cases cited by Chaudhry and Alvi in support of a finding that there was an impairment on their rights, none approach this unique factual pattern. Beginning with the only cited case holding controlling precedent over this Court, *Doe v. Heck* relates not to schoolteachers—with an established rapport with their students—but instead addresses child welfare caseworkers—who are complete strangers to the children they are speaking with. *Heck*, 327 F.3d at 499-508. Furthermore, the questioning of these children by caseworkers regarding familial

31

abuse—without any suspicion of abuse—is not analogous to a student seeking out a teacher for answers she has to religious questions, particularly in the context of the curriculum including religion. *Id.*

The other non-precedential cases cited by Chaudhry and Alvi equally fail to support the proposition that Thorsen's actions rose to unconstitutional interference. *Wickham v. Byrne* found a state statute authorizing grandparent visitation to be facially unconstitutional in the State of Illinois. *Wickham v. Byrne*, 199 Ill.2d 309, 320-21 (Ill. 2002). In *Rhoades v. Penn-Harris-Madison Sch. Corp.*, the court grappled with a complex issue of a school administering a mental health assessment to all students in a high school without parental consent, then diagnosing the named plaintiff with obsessive compulsive disorder and social anxiety disorder. *Rhoades v. Penn-Harris-Madison Sch. Corp.*, 574 F. Supp. 2d 888, 890-92 (N.D. Ind. 2008). And finally, in *Gruenke v. Seip*, a member of a high school swim team—and her mother— sued after her swim coach forced her to take a pregnancy test. *Gruenke v. Seip*, 225 F.3d 290, 295-97 (3d Cir. 2000). These cases are at best tangentially related to the case at hand and don't persuade the Court that a constitutional violation is any more likely in this case.[18]

---

[18] Perhaps more noteworthy in the cited cases—and a sign of findings to come—is that the individual defendants in both *Rhoades* and *Gruenke* were entitled to qualified immunity on claims brought by the parents. *Rhoades*, 574 F. Supp. 2d at 911; *Gruenke*, 225 F.3d at 307. "Although the *existence* of parents' fundamental rights in regard to their children have long been recognized, the substance and contours of those rights are matters of ongoing evolution and are extremely vague and amorphous… It took this court nearly twenty pages… to analyze and determine whether the facts of this case, viewed in the light most favorable to [plaintiffs], establish the violation of a Constitutional right. That itself answers the question whether a reasonable state actor would have understood that his or her actions were unlawful, and that answer is 'no.'" *Rhoades*, 574 F. Supp. 2d at 911.

As Thorsen's actions didn't amount to direct and substantial interference with the rights of Chaudhry and Alvi, evaluation of the merits of any plausible governmental justification is unnecessary. Chaudhry and Alvi's substantive due process claim fails and Thorsen's motion for summary judgment is granted on this claim.

### d. Equal Protection

Next, the Equal Protection Clause of the Fourteenth Amendment also fails to provide an avenue to relief.

The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV § 1. Simply, the Equal Protection Clause directs that all persons similarly situated should be treated alike under the law. *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006); *Plyler v. Doe*, 457 U.S. 202, 216 (1982).

Broadly, the Equal Protection Clause provides two protections: it prohibits state and local governments from discriminating on the basis of certain protected classifications, and it also bars governments from treating a person irrationally within a "class of one." *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). Chaudhry and Alvi again fail to make clear which they are pleading; however, their analysis tracks only for the former. Chaudhry & Alvi Motion for Summary Judgment

33

at 12-13. So, only alleged discrimination on the basis of religion will be discussed herein.[19]

To state a *prima facie* case under the Equal Protection Clause for class discrimination, Chaudhry and Alvi must demonstrate that (1) they are members of a protected class; (2) they are otherwise similarly situated to members of the unprotected class; (3) they were treated differently from members of the unprotected class; and (4) the defendant acted with discriminatory intent. *Allen v. Hasemeyer*, 673 Fed. App'x. 575, 577 (7th Cir. 2017); *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000).

Religion is a suspect classification protected by the Equal Protection Clause. *Abcarian v. McDonald*, 617 F.3d 931, 938 (7th Cir. 2010). Chaudhry and Alvi have sufficiently pled that they are Muslim. Further, there is sufficient evidence that they are otherwise similarly situated to members of the unprotected class (i.e., parents of children at Jacobs High School). They have failed, however, to provide sufficient evidence for either of the last two elements.

First, Chaudhry and Alvi have failed to provide evidence that they were treated differently than similarly situated parents. After Aliya converted to Christianity, there is evidence that Thorsen was worried for her well-being when she was absent from school after winter break. Thorsen dep. at 184:3-184:15. Thorsen reported that he was concerned that her parents had done something "objectionable"

---

[19] To any extent that Chaudhry and Alvi intended to make an equal protection claim based on a class-of-one theory, it would fail for the same reasons described below regarding intent. *See generally, United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008).

because "there [were] plenty of examples of, depending on the Islamic nation, that when somebody leaves Islam they're deemed an apostate... either the mob kills the individual or the government puts them on trial for blasphemy." *Id.* at 184:18-184:23. He continued, "I don't know how the parents are going to react… when they find out that she's left Islam. It could be the worst-case scenario, which I would hope not, that they would send her back to family in Pakistan and have an honor killing." *Id.* at 185:5-185:10. "That was a potential. I wasn't 100 percent certain of it… it could go from that extreme all the way to the parents don't care at all. I don't know where in the range that the parents were at." *Id.* at 186:3-186:8.

Thorsen admitted that his knowledge of these practices influenced his decisions, including not involving school administration or social workers, who he suspected would immediately call Chaudhry and Alvi. *Id.* at 187:12-187:22. He didn't notify the police because he had no evidence "that there was actually something that was going to go wrong." *Id.* at 190:21-190:24. Thorsen only knew that Chaudhry and Alvi were Muslim—not that they would potentially kill for apostasy—and stated that this would only present a problem for him in managing religions that practice honor killings (and specifically not Christianity). *Id.* at 185:21-185:23; 188:15-189:1. Thorsen admits to engaging in negative stereotyping on the issue. *Id.* at 195:6-195:9.

Despite this, there has not been a showing that Chaudhry and Alvi *were in fact* treated differently on account of their being Muslim. No evidence in the record supports the proposition that Thorsen *actually* treated Chaudhry and Alvi any differently than any of his other students' parents. He admits that he had at least

35

one negative stereotype surrounding the Islamic faith; namely, that some Islamic nations participate in the killing of apostates. But the record is absent of any indication that Thorsen acted differently toward Chaudhry and Alvi as a result.

Subjective beliefs are not enough to establish a claim. *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) ("[B]igotry, *per se*, is not actionable"); *Naumovski v. Norris*, 934 F.3d 200, 217 (2d Cir. 2019) (mere stereotypes are insufficient to create an equal protection violation); *Ammons v. Dade City, Fla.*, 594 F. Supp. 1274, 1300 (M.D. Fla. 1984) ("[P]roof of subjective personal bias, motive[,] or ill-will are irrelevant to the inquiry of whether intentional discrimination exists."). There must be actual discriminatory impact, which has not been shown.[20]

It bears repeating that Thorsen only met Chaudhry and Alvi on two occasions, at parent-teacher conferences. Y. Chaudhry dep. at 34:18-34:24. On one of these occasions, the parents arrived late and described a rushed encounter. Alvi dep. at 40:1. These brief encounters, and what was said or not said within them, are insufficient as a matter of law to establish an equal protection claim.

In any event, Chaudhry and Alvi have failed to demonstrate that Thorsen acted with a discriminatory intent. To succeed, they must show that Thorsen acted

---

[20] For instance, the evidence doesn't support a finding that Thorsen necessarily *would have* contacted the parents of a Christian student who was converting to Islam, or any other conversion for that matter. His testimony supports more of an internal case-by-case approach toward when he would contact parents, administration, social workers, the Department of Children and Family Services, or even police. Thorsen dep. at 188:7-188:14. This makes sense. One consideration in Aliya's case was his knowledge of the family dynamics as shared by Aliya, *and* his admitted biases regarding certain aspects of the Islamic faith. Even if a reasonable inference is drawn that Thorsen *may* have treated such a hypothetical student differently or may possibly have contacted that (non-existent) student's parents, it's still not enough for Chaudhry and Alvi to state a claim for an equal protection violation. Thorsen must have actually acted toward them discriminatorily. A reasonable jury couldn't make such a finding.

with a "nefarious discriminatory purpose," and discriminated against them based on their membership in a definable class. *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *Albright v. Oliver*, 975 F.2d 343, 348 (7th Cir. 1992)).

As explained by the Seventh Circuit:

> The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982).

There is no evidence of this type of discriminatory intent on the part of Thorsen toward Chaudhry and Alvi. To the contrary, there is little indication that he paid them mind at all before their complaint with the school about his interactions with Aliya. The leap required to get from his actions—assisting Aliya in a pre-existing religious journey—to a nefarious discriminatory intent against Muslims as a class, is far beyond the capabilities of a reasonable jury, and the Court can't allow the claim to proceed as a matter of law.

Thorsen's intentions from the beginning were to assist Aliya. In doing so, he ostensibly violated school district policy and ultimately lost his job. But it doesn't follow that he committed a violation of the Constitution. Thorsen's motion for summary judgment is granted as to the equal protection claim.

37

### ii.  Immunity

Having established standing to decide this case and taken each of the alleged constitutional violations in kind, we now, for the sake of completeness, move to Thorsen's alleged immunity. *Pearson*, 555 U.S. at 236; *Saucier*, 533 U.S. at 201. Thorsen claims qualified immunity for Chaudhry and Alvi's constitutional claims and statutory immunity for their state law claims.[21]

### a.  Qualified Immunity

Notwithstanding the above findings dismissing Chaudhry and Alvi's Constitutional claims, Thorsen argues that he is entitled to qualified immunity. He is correct. Even if the constitutional claims passed muster to proceed to a jury—which they don't—Thorsen is entitled to qualified immunity as a matter of law. Qualified immunity provides an alternative basis to grant summary judgment to Thorsen.

The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct doesn't violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Pearson*, 555 U.S. at 231; *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

For a right to be "clearly established," it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658,

---

[21] Thorsen has raised the defense of both qualified and statutory immunity. Immunity from federal claims is a matter of federal law, while immunity from state claims is a matter of state law. *Payne ex rel. Hicks v. Churchich*, 161 F.3d 1030, 1038 (7th Cir. 1998). Both bases for immunity will be addressed.

664 n.4 (2012)). A case need not be directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has routinely directed lower courts to not define clearly established law at a high level of generality. *Id.* at 742. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*) (quoting *Saucier*, 533 U.S. at 201). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To defeat qualified immunity, plaintiffs must cite to analogous caselaw that would demonstrate either (i) the conduct is unlawful, or (ii) that the violation is so obvious that a reasonable state actor would know that what he is doing violates the Constitution. *Morrell v. Mock*, 270 F.3d 1090, 1100 (7th Cir. 2001).

Here, the relationship between parents and their child's teacher is not sufficiently established by Chaudhry and Alvi to clearly establish the rights they assert. Indeed, Chaudhry and Alvi virtually concede this point with their scant references to caselaw. In response to Thorsen's motion for summary judgment on the grounds of qualified immunity, they cite only four cases. One of these is used merely to establish that intentional deprivation of a constitutional right is required within a § 1983 claim. *See Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998). Another two—already discussed above—are easily distinguished by their facts. *See Heck*, 327 F.3d at 524; *Wickham*, 199 Ill.2d at 321. Moreover, individual defendants in *Heck* were indeed *granted* qualified immunity. *Heck*, 327 F.3d at 516. *Wickham* doesn't

39

address immunity at all, because it was a challenge under the Illinois State Constitution not seeking personal damages. *Wickham*, 199 Ill.2d at 310-14. Likewise, the last case cited by Chaudhry and Alvi also doesn't address qualified immunity, relating only to the elements of an equal protection claim. *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).

If anything, the totality of cases cited by Chaudhry and Alvi demonstrate that the unique nuances of this case and its constitutional claims run *counter* to any argument that they are clearly established. *See Heck*, 327 F.3d at 527 (granting qualified immunity); *Rhoades*, 574 F. Supp. 2d at 911 (same); *Gruenke*, 225 F.3d at 307 (same). Thorsen is immune from liability for the constitutional claims.

### b. Statutory Immunity

Finally, as to the state law claims brought by Chaudhry and Alvi for invasion of privacy and intentional infliction of emotional distress, Thorsen argues he is immune from liability under the Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), 745 ILCS 10/1-101, et seq.[22] He is again correct.

To begin, "invasion of privacy" is not a standalone claim in the State of Illinois. Rather, it is a collection of several closely related torts, including (1) unreasonable intrusion upon the seclusion of another, (2) appropriation of another's name or

---

[22] Thorsen also argues that the statute of limitations and the doctrine of waiver bar recovery on the state law claims. The Court need not reach these arguments, other than to note that the statute of limitations is another meritorious defense. This action was filed more than one year after the alleged claims accrued and no tolling provision seems applicable.

likeness, (3) public disclosure of private facts, and (4) false light. *Roehrborn v. Lambert*, 277 Ill.App.3d 181, 184 (Ill. App. Ct. 1995). Though Chaudhry and Alvi have not properly labeled what they are trying to claim, surrounding context in the fourth amended complaint indicates they intended to allege a public disclosure of private facts. Fourth Amended Complaint at ¶¶ 135-141. This requires they prove that "(1) publicity was given to the disclosure of private facts; (2) the facts were private, and not public, facts; and (3) the matter made public was such as to be highly offensive to a reasonable person." *Browning v. AT&T Corp.*, 682 F. Supp. 2d 832, 839 (N.D. Ill. 2009) (quoting *Cordts v. Chi. Tribune Co.*, 369 Ill.App.3d 601, 607 (Ill. App. Ct. 2006)).

Meanwhile, intentional infliction of emotional distress requires a plaintiff to show that the defendant engaged in "truly extreme and outrageous conduct," with either the intention that the conduct inflict severe emotional distress or knowledge of a high probability that conduct will cause severe emotional distress, and the conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 126 Ill.2d 78, 86 (Ill. 1988).[23]

Thorsen claims immunity from both of these torts, through the Tort Immunity Act. In full, the relevant statutory provision provides:

> Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused… A public employee is not liable for his act or omission in the execution or enforcement of

---

[23] The Court recognizes that the factual record largely doesn't support either of these state law claims. However, Thorsen only briefed the issue of immunity, so the Court will only address the issue of immunity.

41

any law unless act or omission constitutes willful or wanton conduct.

745 ILCS 10/2-201, 202.

In other words, if a public employee is accused of wrongful discretionary acts or omissions involving the determination of policy, they are afforded blanket immunity. *Trotter v. Sch. Dist. 218*, 315 Ill.App.3d 1, 12-13 (Ill. App. Ct. 2000). But if they are accused of wrongful acts that are ministerial in nature, they are immune only if the act or omission wasn't willful or wanton. *Id.* at 13. Discretionary tasks are those which are unique to a particular public office. *Arteman v. Clinton Comm. Unit Sch. Dist. No. 15*, 198 Ill.2d 475, 484-85 (Ill. 2002) (internal quotations omitted). Ministerial tasks are "those that a person performs on a given state of facts, in a prescribed manner, in obedience to the legal authority, and without reference to the official's discretion as to the propriety of the act." *Trotter*, 315 Ill.App.3d at 13 (citing *Synder v. Curran Twp.*, 167 Ill.2d 466, 474 (Ill. 1995)).

Thorsen's actions were decidedly discretionary. He weighed the options at his disposal for managing a student in distress and elected to talk to her about religion. He elected to provide her with resources in the community rather than alerting her parents, administration, social workers, police, or the Department of Children and Family Services. And he provided her a Bible from a third-party, from his unique position as her teacher. To the extent any of Thorsen's tasks were arguably ministerial—particularly his role as the faculty sponsor to Uprising—his actions don't approach willful and wanton conduct as a matter of law. He merely answered

42

questions to the best of his ability, even if his answers were influenced by his own personal beliefs.

Once in the discretionary realm, the immunity provided to public employees by the statute is extraordinarily broad. *See, e.g., Courson ex rel. Courson v. Danville Sch. Dist. No. 118*, 333 Ill.App.3d 86, 91 (Ill. App. Ct. 2002) (shop teacher immune after intentionally removing a safety shield from a table saw causing a middle school student injury); *McGurk v. Lincolnway Comm. Sch. Dist. No. 210*, 287 Ill.App.3d 1059, 1060 (Ill. App. Ct. 1997) (school district immune after modifying a football helmet to remove its safety system, subsequently causing a student-athlete to suffer permanent closed head injuries); *Trotter*, 315 Ill.App.3d at 22 (unqualified lifeguard immune after a student drowned during high school gym class). This case is not the one to buck that trend. Thorsen is immune from Chaudhry and Alvi's state law claims.

### iii. Thorsen's Counterclaim

The above decisions remove all of Chaudhry and Alvi's claims for liability against Thorsen. It also removes the Court's independent basis of jurisdiction. 28 U.S.C. § 1331. Before proceeding, the Court must first determine whether to retain jurisdiction. Only then can the Court address Thorsen's counterclaim.

### a. Subject-Matter Jurisdiction

When all claims giving rise to original jurisdiction have been resolved, a district court *may* maintain subject-matter jurisdiction over those claims that fall within its supplemental jurisdiction under 28 U.S.C. § 1367(a) (supplemental

43

jurisdiction). *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010); *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 559 F.3d 881, 883 (7th Cir. 2009). But it doesn't have to. In its discretion, a court may decline to exercise supplemental jurisdiction after it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); *Miller*, 600 F.3d at 738. Indeed, there is a presumption that before trial, the district court "will relinquish [that] jurisdiction over any supplemental claim to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008). The only sure-fire way for a court to run afoul of this jurisdictional dilemma is by not deciding at all.[24] *Nightingale*, 589 F.3d at 883.

Three categories of exceptions rebut the presumption. *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514-15. First, when a statute of limitations has run on the supplemental claim, precluding the filing of a separate suit in state court; second, when substantial judicial resources have been committed, which would cause substantial duplication of effort; and third, when it is absolutely clear how the supplemental claims can be decided. *Id.* (quoting *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)). Because at least the first two conditions are satisfied, the Court will retain jurisdiction.

In Illinois, the statute of limitations for defamation is one year, beginning to run when the defamatory statement was published. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 923 (7th Cir. 2003) (citing *Buechele v. St. Mary's Hosp.*,

---

[24] Neither party briefed this issue, so the Court is again making an analysis of its own accord. Again, after six years of litigation and a mess of summary judgment, the Court wasn't going to have the parties provide unhelpful briefing on this discretionary issue.

44

156 Ill.App.3d 637 (Ill. App. Ct. 1987)). A dismissal without prejudice is treated for statute of limitations purposes as if the lawsuit had never been filed. *Muzikowski*, 322 F.3d at 923; *see also Carr v. Tillery*, 591 F.3d 909, 917 (7th Cir. 2010) ("[A] dismissal can be without prejudice yet have preclusive effect."). The publications cited by Thorsen in his counterclaim for defamation were published on June 28, 2021. *See* Thorsen Amended Answer and Counterclaim ex. 1. Thus, the statute of limitations ran on June 28, 2022. Further, if the grotesque length of this Order is any indication, substantial judicial resources have clearly been spent ruling on this matter. The action has been pending for nearly six years in this court. Even notwithstanding a statute of limitations bar, asking a state court to duplicate this effort and untangle the facts in a second venue would be a disservice. *See Haroco, Inc. v. Am. Nat'l Bank & Trust Co.*, 814 F. Supp. 655, 656 (N.D. Ill. 1992) ("And, upon reflection, we agree that we should retain jurisdiction over the pendent claims. It would border on a violation of the Eighth Amendment if the parties had to start over in another forum."). The judges in the Twenty-Second Judicial Circuit have enough work. They don't need this case added to their to-do list.

Given the statute of limitations, as well as the substantial judicial resources already spent on the case, the Court will retain jurisdiction under supplemental jurisdiction and decide the cross-motions for summary judgment on Thorsen's counterclaim.[25] 28 U.S.C. § 1367(a).

---

[25] As to the third category of exceptions to rebut the presumptive remand, the Court sincerely hopes the outcome of this case becomes clear to both parties after this Order. It is time for cooler heads to prevail. This matter is ripe for settlement, if it wasn't previously.

45

### b. *Defamation*

In speaking to the media, Chaudhry and Alvi made a choice. They gained speed and public vindication in exchange for truth and accuracy. The public eye, through the media, doesn't take six years to reach summary judgment. But they also don't go through the painstaking process of fact discovery. With the benefit of fact discovery, at least some of the statements they made to the media were false, and others may constitute defamation *per se*. Because material disputes of fact exist as to what statements Chaudhry and Alvi published—versus those that were merely the expression of their words by the writer—the cross-motions for summary judgment are denied on the counterclaim.

To state a claim for defamation in Illinois, a plaintiff (here counter-plaintiff) must present facts that (i) the defendant (counter-defendant) made a false statement about the plaintiff, (ii) that the defendant made an unprivileged publication of that statement to a third party, and (iii) that this publication caused damages. *Green v. Rogers*, 234 Ill.2d 478, 491 (Ill. 2009). "Publication" is a term of arm in defamation law. *Missner v. Clifford*, 393 Ill.App.3d 751, 763 (Ill. App. Ct. 2009). "Any act by which defamatory matter is communicated to someone other than the person defamed is a publication." *Id*.

Two types of defamation are recognized in Illinois: defamation *per se* and defamation *per quod*. *Green*, 234 Ill.2d at 491-95. Defamation *per se* involves statements so harmful to one's reputation that damages are presumed; whereas, defamation *per quod* involves statements which require extrinsic evidence to show

46

their defamatory meaning. *D'Ambrosio v. Rajala*, 783 F. Supp. 3d 1077, 1089 (N.D. Ill. 2025) (quoting *Muzikowski*, 322 F.3d at 924). Thorsen alleges defamation *per se*.

A statement is defamatory *per se* if its harm is obvious and apparent on its face. *Green*, 234 Ill.2d at 491. Specifically, there are five categories of statements that are considered defamatory *per se*: (i) words that impute a person has committed a crime, (ii) words that impute a person is infected with a loathsome communicable disease, (iii) words that impute a person is unable to perform or lacks integrity in performing his or her employment duties, (iv) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (v) words that impute a person has engaged in adultery or fornication. *Id.* at 491-92. Thorsen alleges Chaudhry and Alvi's published statements run afoul of both (iii) and (iv). Thorsen doesn't argue that the statements—even that he groomed Aliya—are actionable under (i).

Even if a statement fits into one of the categories for defamation *per se*, a defense exists when the statement is "substantially true." *Seitz-Partridge v. Loyola Univ. of Chi.*, 369 Ill.Dec. 692, 699 (Ill. App. Ct. 2013). Substantial truth is normally a question for the jury. *Id.* To be substantially true, only the "gist" or "sting" of the allegedly defamatory statement must be true. *Andrews v. At World Properties, LLC*, 474 Ill.Dec. 307, 316 (Ill. App. Ct. 2023) (quoting *Harrison v. Chi. Sun-Times, Inc.*, 314 Ill.App.3d 555, 563 (Ill. App. Ct. 2003)). The absence of a viable constitutional claim does not foreclose the possibility that the "gist" or "sting" of the allegations is still substantially true. In other words, just because Thorsen didn't establish religion,

47

nor violate a parent's substantive due process rights, nor violate the Equal Protection Clause, and just because he is immune from liability based on qualified and statutory immunity, doesn't *necessarily* mean that he didn't still "brainwash" or "indoctrinate" Aliya.

A second defense exists when the comments are subject to an innocent interpretation. *Andrews*, 474 Ill.Dec. at 315 (citing *Hadley v. Doe*, 382 Ill.Dec. 75 (Ill. App. Ct. 2014)). This occurs if the words and implications, considered in context and given their natural and obvious meaning, are reasonably capable of an innocent interpretation. *Andrews*, 474 Ill.Dec. at 315 (citing *Tuite v. Corbitt*, 224 Ill.2d 490, 502 (Ill. 2006)).

Here, in mid-2021 Chaudhry and Alvi published statements to a third party in Paddock Publications, Inc., which subsequently publicized those statements in online print including but not limited to the Northwest Herald and the Daily Herald. Thorsen Statement at ¶ 17. Specifically, the articles claimed Thorsen "groomed and indoctrinated" Aliya and "brainwashed" her to convert to Christianity. *Id.* at ¶¶ 19-20; Thorsen Amended Answer and Counterclaim ex. 1.

First, if Chaudhry and Alvi published a statement that Thorsen "groomed" Aliya, this would constitute defamation *per se*. Every reasonable person knows what "grooming" means in the context of a teacher-child relationship.[26] And calling

---

[26] Indeed, the State of Illinois criminalizes the act of "grooming" as a Class 4 felony. 720 ILCS 5/11-25. Chaudhry and Alvi attach a generative artificial intelligence question and answer response as Exhibit 1 to their motion for summary judgment, in apparent support of an innocent construction of the word "groomer." This argument is preposterous. No reasonable person could claim that in using the word "groom," the article was *actually* just innocently claiming that Thorsen was a "man on his wedding day." Chaudhry & Alvi Motion for Summary Judgment ex. 1 at p. 1. Nor that he was a "servant/official in a royal household." *Id.* Nor that they were talking about "animal care." *Id.* at p. 2. The obvious and

Thorsen one at *least* imputes a lack of integrity onto him in performing his duties as a teacher. For their part, Chaudhry and Alvi claim that although they know the context in which "grooming" can be seen, it wasn't meant *that way*. Thorsen Statement at ¶ 27; Alvi dep. at 12:20-13:8; Y. Chaudhry dep. at 68:7-68:11. This wouldn't matter. The very essence of defamation *per se* is that it doesn't matter how the published falsehood was intended, but the damaging impact that it causes anyway.

But there is material dispute of fact as to whether they did in fact publish that Thorsen was a "groomer" or otherwise "groomed" Aliya, foreclosing the possibility of summary judgment on the issue. Certainly the article calls Thorsen a groomer. However, it is not set in quotation marks, and it is not clear whether this defamatory word came from Chaudhry and Alvi, or if it was the writer's own interpretation. Y. Chaudhry dep. at 67:11-67:15 ("In those exact words, I cannot say that I said that."); Alvi dep. at 13:2-13:6 ("Okay. For *when I said groomed*, what I meant…") (emphasis added). This factual dispute is for a jury to decide.[27]

The nature of the remaining allegedly defamatory language in the article must also be decided by a jury. A teacher "indoctrinating" a student—unlike "grooming" a student—could be subject to an innocent interpretation. Likewise, as with "groomer,"

---

only connotation is "[t]o establish trust with someone, often a child or vulnerable person, in order to exploit or abuse them… Example: The authorities investigated him for grooming teenagers online." *Id.* The Court doesn't believe that this is a proper use of generative artificial intelligence to define a term as envisioned by Judge Newsome. *See Snell v. United Specialty, Inc.*, 102 F.4th 1208, 1221 (11th Cir. 2024).

[27] There is no record of the reporter being deposed. The Court recognizes that the Reporter's Privilege can be somewhat cumbersome. *See* 735 ILCS 5/8-902, et seq. But the testimony of the reporter would go a long way in resolving whether Chaudhry or Alvi called Thorsen a "groomer."

neither the article nor the record reflects whether Chaudhry and Alvi published "indoctrinate" to the writer or if this word was instead the creative spin the writer put on Chaudhry and Alvi's other, non-defamatory words. With respect to "brainwash," Yosuf Chaudhry admits to publishing this characterization. Y. Chaudhry dep. at 68:15-68:18. But neither "indoctrinate" nor "brainwash" carry the same facially damaging weight as "groomer." A jury must decide whether publicly accusing a teacher of "indoctrinating" or "brainwashing" a student imputes that the teacher is unable to perform or lacks integrity, or if it otherwise prejudices the teacher in their profession. Moreover, it is for a jury to decide whether it is substantially true that Thorsen's actions constituted indoctrination or brainwashing, despite not rising to the level of a constitutional violation.

## V.    Conclusion

For the above reasons, Thorsen's motion for summary judgment [282] is granted in part and denied in part. Chaudhry and Alvi's motion for summary judgment [284] is denied. All claims against Thorsen are dismissed and the lone claim remaining before the Court is Thorsen's counterclaim for defamation.

By March 27, 2026, the parties are directed to provide three dates to Magistrate Judge Iasparro for a **mandatory** settlement conference. All parties, their counsel, insurance representatives (if any), third-party administrators (if any), and persons with full settlement authority are to appear in-person and follow all orders of Judge Iasparro as it relates to his management of the settlement conference. By the same date, Chaudhry and Alvi are further ordered to place an unredacted version

of their Statement of Fact ex. 7 onto the record, as it was considered by the Court and must be unsealed.


Date: March 18, 2026                               By:    _____
                                                            Iain D. Johnston
                                                            United States District Judge